**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA M. SWANSON, *et al.* | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:08-cv-00184 |
| | ) | |
| BANK OF AMERICA, N.A. and FIA | ) | |
| CARD SERVICES, N.A., | ) | Judge Amy St. Eve |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Response in Opposition to Defendants'
Motion to Dismiss the Second Amended Complaint**

This case arises from Defendants' practice of reviewing its credit card accounts at the end of each account's billing cycle, targeting certain cardholders for interest rate increases as a result of that review, and then retroactively imposing the selective rate increases on the cardholders' outstanding balances for the billing cycle that has already passed. *See* Second Amended Complaint ("SAC") ¶ 6. Ms. Swanson claims that this practice violates federal and state law.

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6). In evaluating Defendants' motion, the complaint's allegations must be accepted as true, all reasonable inferences must be drawn in Ms. Swanson's favor, and her claims may not be dismissed unless Defendants prove that she cannot obtain relief. *See McMillan v. Collection Professionals, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006).

**The Facts and Claims at Issue**

Each month, Defendants review their cardholders' accounts at the end of the billing cycle to determine whether to increase the interest rate for each account based on an undisclosed methodology. *See* SAC ¶¶ 7, 9. If the undisclosed methodology dictates that the rate should be increased, and if there has been a late payment or the account balance exceeds the account's limit during the billing cycle, Defendants backdate the effective date of the increase to the start of the billing cycle just ended. *See* SAC ¶ 7. Then Defendants recalculate the interest charges for that cycle at the new, higher rate, adding the additional charges resulting from this recalculation to

the cardholder's bill. *See* SAC ¶ 7. As a result of this practice, Defendants impose a penalty charge on the cardholder in the form of additional "interest" charges. *See* SAC ¶ 7.[1]

Defendants impose these selective, retroactive rate increases without advance notice. *See* SAC ¶ 9. As a result, cardholders who are subjected to this practice, who were led to believe that they were being charged at the rate shown on their billing statement before the billing cycle began, incur a higher interest rate for that cycle than what Defendants represented. *See* SAC at ¶ 9. Ms. Swanson was subjected to this practice. *See* SAC ¶¶ 11-16.

Based on these facts, Ms. Swanson makes three claims. First, she claims that Defendants' failure to give written notice of the specific increase in her interest rate before the effective date of the change violates the Truth-In-Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") (Count I). Second, she claims that the additional money Defendants charged her by retroactively increasing her interest rate is an illegal penalty that unjustly enriched Defendants (Count II). Third, she claims that Defendants' retroactive-rate increase practices violate the Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/2 (Count III).

In response, Defendants make three arguments. First, they argue that Ms. Swanson's claims should be dismissed because one of her lawyers was involved in some similar cases in different courts that were unsuccessful. Second, they claim that Ms. Swanson fails to state a claim under TILA. Third, they claim that Ms. Swanson's state law claims are preempted by the National Bank Act. As explained below, Defendants' motion should be denied.

## II.    Ms. Swanson's Claims Must Be Adjudicated on Their Own Merit.

Defendants' lead argument is that the Court should prejudge Ms. Swanson's claims because one of her lawyers unsuccessfully represented different clients in different cases

---

[1] Paragraph 8 of the complaint illustrates this practice with a hypothetical cardholder carrying a $10,000 balance at an interest rate of 11.99%, and whose rate increases to 26.99%. Defendants tell the cardholder in their monthly statement at the start of the billing cycle that their rate is 11.99%. At the 11.99% rate, about $100 in interest will accrue on the cardholder's balance during the billing cycle. Defendants do not increase the cardholder's rate to 26.99% until they conduct their monthly review at the end of the billing cycle, but they apply the increase as if it occurred at the start of the billing cycle. This results in an after-the-fact assessment of about $125 in additional "interest" on the cardholder's balance for that billing cycle, or about $225 in total "interest" charges instead of $100. *See* SAC ¶ 8.

involving similar issues in different courts.  There is no principled basis for this argument.  Ms. Swanson has never advanced the claims at issue before, and she has no control over what happened in a different lawsuit.  Moreover, the "District Courts are free to disagree with one another . . ." *U.S. v. Santos*, 1996 WL 617329 at *2 (S.D.N.Y. 1996) (citation omitted).  Federal Rule 12(b)(6) requires Ms. Swanson's claims to be evaluated based on her complaint, not the complaint and arguments presented elsewhere.  Accordingly, Ms. Swanson is entitled to have her claims adjudicated based on their own merit.

**III.   Ms. Swanson States a Claim under the Truth-in-Lending Act.**

    **A.   Defendants Failed to Give Ms. Swanson Written Notice of the Specific Rate Increase on Ms. Swanson's Account before the Increase's Effective Date.**

Congress enacted TILA to ensure the "meaningful disclosure" of credit terms and protect borrowers against unfair lending practices.  *See* 15 U.S.C. § 1601(a) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms . . . and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.")  For open-end credit plans (such as credit cards), TILA and its implementing regulation, 12 C.F.R. § 226.1, *et seq.* ("Regulation Z"), require lenders to make certain disclosures of credit terms at the *start* of the credit relationship, and *during* the relationship.

Among other terms, at the start of the credit relationship the lender must disclose the various rates at which interest may accrue on the cardholder's account's balance.  *See* 12 C.F.R. § 226.6(a)(2).  This disclosure must also state "[t]he circumstances under which the rate(s) may increase . . ." 12 C.F.R. 226.6(a)(2) at fn. 12.

But, as noted, the start of the credit relationship is not the end of the creditor's disclosure obligations.  When the lender changes the rate on a cardholder's account, TILA also requires the lender to give a *separate* written notice of the specific change.  *See* 12 C.F.R. § 226.9(c)(1) (written notice is required whenever "any term required to be disclosed under section 226.6 is changed . . ."); 12 C.F.R. § 226.6(a)(2) (requiring disclosure of the applicable rate).  Also, in the case of a default, TILA requires this notice to be given "*before* the effective date of the change." 12 C.F.R. § 226.9(c)(1) (emphasis added).

Defendants did not meet this obligation.  They never gave Ms. Swanson written notice of the specific increase in her rate before the effective date of the change.  This is because Defendants retroactively increased the rate on her account with an effective date as of the start of the billing cycle *just ended*.  *See* SAC ¶ 13.  As a result, Ms. Swanson did not learn of the change until about a month after its effective date, when she received the next billing statement reflecting the change.  *See*, *e.g.*, SAC ¶ 14.  Thus, Defendants violated TILA.

**B.      Defendants Did Not Give Notice of the "Specific Change" to Ms. Swanson's Account in Their Initial Disclosures.**

In response, Defendants claim that they gave written notice of the change before its effective date because the cardholder agreements Defendants sent Ms. Swanson state that Defendants might increase Ms. Swanson's rate if her account went overlimit, and because they also state the highest rate that would apply if this occurred.  This argument confuses Defendants' disclosure obligations at the *start* of the credit relationship with their disclosure obligations *during* the credit relationship.  Again, TILA required Defendants to initially disclose the applicable rate and the circumstances under which the rate could change (§ 226.6(a)(2)), and it *also* required them to give written notice if a specific change actually occurred, before its effective date (§ 226.9(c)(1)).  At best, the cardholder agreements only meet the first of these two obligations.  They cannot also meet the obligation to give written notice when a specific change occurs because that would render § 226.9(c)(1) redundant to § 226.6(a)(2), improperly writing § 226.9(c)(1) out of Regulation Z.  *See First Charter Fin. Corp. v. U.S.*, 669 F.2d 1342, 1350 (9th Cir. 1982) (a regulation should be construed so as to give effect to all of its terms).

Defendants' argument is also flawed because the cardholder agreements do not tell Ms. Swanson that her APR *would* increase when her account went into default here.  They only state that Defendants' *might* increase her APR if her account went into default.  *See* Defendants' Brief at p. 4 ("we *may* elect to increase your Purchase, Cash Advance and/or Balance Transfer APRs to the Penalty APRs.") (emphasis added).  As indicated in the complaint, which must be accepted as true, Defendants do not automatically increase the rate on an account when it does into default.  *See* SAC ¶¶ 7, 9 (increase occurs if the account is overlimit *and* the bank decides to impose the increase under its undisclosed methodology).  Accordingly, Defendants' mere

4

disclosure in the cardholder agreements that they *might* increase Ms. Swanson's APR if her account went into default does not satisfy § 226.9(c)(1) of Regulation Z.[2]

**C.     The Staff Commentary to Regulation Z Does Not Excuse Defendants' Failure to Give Written Notice Before the Effective Date of the Specific Change.**

Unable to square their argument with Regulation Z, Defendants turn to the Staff Commentary.  Specifically, they claim that their failure to give notice is excused by a quote from a snippet of the first sentence of Comment 1 to for § 226.9(c), which states that advance notice of a specific change in the rate is not required "if the specific change is set forth initially, such as: [r]ate increases under a properly disclosed variable-rate plan."  Defendants' Brief at p. 7, *quoting* 12 C.F.R. pt. 226, Supp. 1, § 226.9(c), cmt. 1.  This argument fails for two reasons.

First, even taking Defendants' bit quote of Comment 1 at face value, the facts of this case do not meet it.  This is because Defendants did not set forth the "specific change" in their initial disclosures.  Again, the specific change was the increase in Ms. Swanson's APR after her account went into default, the initial disclosures do not state that a default will necessarily result in an increase, and it won't because Defendants do not necessarily impose a rate increase when a default occurs.

Second, the full sentence of Comment 1 to § 226.9(c) that Defendants quote makes clear that notice is only excused for rate changes that are described in the initial disclosure and that *automatically* occur upon the happening of some event:

> No notice of a change in terms need be given if the specific change is set forth initially, such as: Rate increases under a properly disclosed variable-rate plan, a rate increase that occurs when an employee has been under a preferential rate agreement and terminates employment, or an increase that occurs when the consumer has been under an agreement to maintain a certain balance in a savings

---

[2]  Defendants also cite an August 2006 Supplement to Change of Terms Notice they allegedly sent Ms. Swanson.  Defendants may not rely on matter not referenced in the complaint.  Citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002), Defendants claim they can rely on the notice.  But the document in *Tierney* was attached the complaint – here it is not.  Moreover, the notice is not "integral" to Ms. Swanson's claims because her complaint does not rely on it.  Regardless, even if the Court considers the notice, it does not help Defendants.  Like the cardholder agreements, the notice only states that Ms. Swanson's rate *might* increase if her account went overlimit, and not that it necessarily *would* increase.  *See* Defendants' Brief at p. 5.

account in order to keep a particular rate and the account balance falls below the specified minimum.

12 C.F.R. pt. 226, Supp. 1, § 226.9(c), cmt. 1.[3]  Because the rate changes described above are automatic, the initial disclosure tells the cardholder all that can be known about when a change *will* occur, *i.e.*, a separate, later notice would add nothing.  Here, Ms. Swanson did not know that the default would result in a rate increase because the agreement does not state that it always will, and because it does not always happen.

Moreover, in the examples in the comment above, it would be impossible for the lender to give notice before the effective date of the change because the lender does not know or control when an index will change (causing a rate change in a variable-rate plan), or when the cardholder will leave their job or let their savings balance fall below the minimum.  By contrast, here Defendants knew whether a rate increase would occur in the event of default because they created the undisclosed methodology that determines when an increase will occur.  *See* SAC ¶ 9.

Any lingering doubt that the Commentary requires a separate notice under the facts of this case is dispelled by the comments to the specific subparagraph of § 226.9(c) at issue, *i.e.* subparagraph (1) of § 226.9(c) (the comment Defendants cites goes to § 226.9(c) generally).  Comment 3 to § 226.9(c)(1) notes that where, as here, a rate is changed as a result of a default, notice of the change must be given at or before the effective date of the change:

> a notice of change in terms *is required*, but it may be mailed or delivered as late as the effective date of the change--in two circumstances:
>
> . If there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default.  . . .

12 C.F.R. pt. 226, Supp. 1, § 226.9(c)(1), cmt. 3 (emphasis added).  In short, the commentary

---

[3]  Ms. Swanson's account is a variable rate plan.  *See* Declaration of David O'Connell at Exhibit B (Dkt. #41-3, p. 2), ¶ 3.3.1.a.  A variable-rate plan is one "under which rate changes . . . are tied to an index or formula."  12 C.F.R. pt. 226, Supp. 1, § 226.6(a)(2), cmt. 2.  An example of such an index is "Treasury bill rates."  *Id.*  The Commentary's reference to "changes incident to a variable-rate plan" pertains to rate changes resulting from a change in the applicable index, *not* changes that occur for other reasons.  *See* 12 C.F.R. pt. 226, Supp. 1, § 226.6(a)(2), cmt. 2 ("In contrast, the creditor's contract reservation to increase the rate without reference to such an index or formula . . . would not be considered a variable-rate plan"), and cmt. 6 ("Variable rate plan--circumstances for increase.") (discussing changes in the applicable index).

does not excuse Defendants' failure to give notice of the specific change to Ms. Swanson's rate before the effective date of the change, as required by § 226.9(c)(1) of Regulation Z.

### D.    The Cases Defendants Cite Do Not Reconcile the Facts with the Law.

Defendants cite some district court cases that found a bank's failure to give notice of the specific rate change to be excused under circumstances similar to this case, but none explain how a general initial disclosure of the circumstances under which the cardholder's APR *might* change under § 226.6(a)(2) can also satisfy the separate obligation to give notice of a specific rate change before its effective date under § 226.9(c)(1). Instead, the cases rely on the same snippet regarding automatic rate changes from Comment 1 to § 226.9(c) that Defendants cite and/or they decided that the initial disclosures in the cardholder agreement regarding what *might* lead to a rate increase and the rate that *could* be applied in that event were somehow sufficient meet the separate obligation to send notice of a specific change in the rate before its effective date under § 226.9(c)(1).[4]

As shown, § 226.9(c)(1) unequivocally required Defendants to give Ms. Swanson a separate notice of the change to her rate before its effective date, the snippet from the commentary to § 226.9(c) that Defendants cite only pertains to automatic rate changes (and thus it does not apply here), and Comment 3 to § 226.9(c)(1) flatly confirms Defendants' obligation to send notice of a specific rate change stemming from a default before the effective date of the change. Accordingly, there is no legitimate reason to follow the non-binding decisions Defendants cite. In short, Defendants violated § 226.9(c)(1), Ms. Swanson states a claim under TILA, and Defendants' motion to dismiss Count I should be denied.

---

[4]    *See Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740 at *2 (N.D. Cal. 2006) (relying on the same partial reading of comment 1 to § 226.9(c) that Defendants cite, and discussing comment 1 to § 226.9(c) and comment 3 to § 229(c)(1) in reverse order, incorrectly suggesting that the former modifies the latter rather than the other way around); *Penner v. Chase Manhattan Bank USA, N.A.*, 2006 WL 2192435 at *2 (W.D. Wash. 2006) (following *Evans*, including its misreading of the commentary); *Williams v. Wash. Mut. Bank*, 2008 WL 115097 at *2-*3 (E.D. Cal. 2008) (relying on *Evans* and *Penner*, not addressing Comment 3 to § 226.9(c)(1), and relying a request for comments on proposed changes to Regulation Z that have not yet been adopted); *McCoy v. Chase Manhattan Bank USA*, 06-107, Civil Minutes (C.D. Cal. Aug. 10, 2006) (not addressing Comment 3 to § 226.9(c)(1)).

**IV.     The National Bank Act Does Not Preempt Ms. Swanson's State Law Claims.**

Defendants do not dispute that Ms. Swanson adequately pleads a claim for unjust enrichment and a violation of the Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/2 ("ICFA").  Instead, they argue that her claims are preempted by federal law. Preemption is an affirmative defense for which Defendants bear the burden of proof.  *See Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) ("Federal preemption is an affirmative defense upon which the defendants bear the burden of proof.")

A preemption claim must be evaluated with due respect for the state sovereignty.  *See*, *e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) ("our Constitution establishes a system of dual sovereignty between the States and the Federal Government."); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("the States are independent sovereigns in our federal system . . .") Accordingly, "courts should not lightly infer pre-emption . . ." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987).

"[S]tate law can be preempted in either of two general ways.**"** *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).  The first is when Congress legislates to occupy an entire field of endeavor, leaving no room for state legislation, *i.e.* "field preemption."  *See Silkwood*, 464 U.S. at 248.  Defendants cite a case that discusses field preemption (Defendants' Brief at p. 8, citing *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987)), but they do not meaningfully argue that the National Bank Act ("NBA") preempts all state law from applying to national banks.  Nor can they legitimately do so because "federal banks 'are subject to the laws of the State, and are governed in their daily course of business *far more* by the laws of the State than of the nation.'"  *Atherton v. F.D.I.C.*, 519 U.S. 213, 222 (1997) (emphasis added), *quoting Nat'l Bank v. Commonwealth*, 76 U.S. 353, 9 Wall. 353, 361 (1869).

The second type of preemption arises from a conflict between state law and federal law, *i.e.*, "when it is impossible to comply with both state and federal law" or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress". *Silkwood*, 464 U.S. at 248 (citations omitted).  Unable to claim field preemption, Defendants

instead claim that Ms. Swanson's state law claims expressly or impliedly conflict with the powers given to national banks by the NBA. As explained below, Defendants are mistaken.

    **A.**    **The Consumer Fraud Claim Is Consistent With the NBA, and Thus Not Preempted, Because the NBA Prohibits National Banks from Engaging in the Same Conduct Prohibited by the Illinois Consumer Fraud Act.**

Contrary to the notion that Ms. Swanson's consumer fraud claim conflicts with the powers granted to national banks, that claim is consistent with the NBA's express regulatory provisions. Specifically, the NBA's implementing regulations provide that "[a] national bank shall not engage in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1) . . ." 12 C.F.R. § 7.4008(c).

Ms. Swanson's consumer fraud claim is consistent with this provision because the Illinois Consumer Fraud Act ("ICFA") and § 5 of the Federal Trade Commission Act ("FTCA") prohibit the same conduct. Section 5 of the FTC Act provides:

> Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

15 U.S.C. § 45(a)(1). Likewise, § 505/2 of the ICFA provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful . . ."

815 ILCS 505/2. Indeed, the Illinois legislature expressly intended § 505/2 to be co-extensive with § 5 of the FTC Act because § 505/2 states that "[i]n construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2. Accordingly, because the NBA prohibits or denies national banks the power to engage in the same conduct that the ICFA prohibits, Ms. Swanson's consumer fraud claim is necessarily consistent with the NBA. *See*, *e.g.*, *Patterson v. Regions Bank*, 2006 WL 3407852 at *6 (S.D. Ill. 2006) (Illinois

consumer fraud claim not preempted in part for removal purposes because banks may not commit unfair or deceptive acts). Accordingly, Defendants cannot meet their burden of proving that Ms. Swanson's consumer fraud claim conflicts with, and thus is preempted by, the NBA.

### B.    Ms. Swanson's Common Law Claim Does Not Conflict with the NBA.

As noted above, national banks remain subject to most state laws. *See Atherton*, 519 U.S. at 222 ("federal banks 'are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation.'") In particular, national banks remain subject to state laws of general application. *See Watters v. Wachovia Bank, N.A.*, 127 S.Ct. 1559, 1567 (2007) ("Federally chartered banks are subject to state laws *of general application* in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA.") (emphasis added); *see also Patterson*, 2006 WL 3407852 at *6 ("[E]xpressly excluded from preemption are state laws only incidentally affecting the bank's lending power . . ."), *citing* 12 C.F.R. § 7.4008(e).

It is undisputed that Ms. Swanson's common law claim is based on a law of general application. Specifically, Count II alleges that Defendants were unjustly enriched by violating the general common law prohibition against penalties. *See* SAC ¶¶ 28-31.

Nevertheless, Defendants argue that Ms. Swanson's state law claims "conflict" with the powers granted national banks by the NBA. As shown above, that is categorically wrong as to Ms. Swanson's consumer fraud claim. However, because Defendants discuss both of Ms. Swanson's state law claims, for the sake of clarity she explains why Defendants' arguments do not satisfy their burden of proving that either of her claims conflict with the NBA.

### 1.    Ms. Swanson Does Not Challenge the Rate of Interest Charged.

First, Defendants claim that Ms. Swanson's state law claims conflict with the NBA provision allowing banks to charge any rate of interest permitted by their home state (12 U.S.C. § 85) because, allegedly, Ms. Swanson challenges the interest rate Defendants charged her. That is false. Defendants do not and cannot point to any paragraph in the complaint in which Ms. Swanson claims that the rate charged was "too high", "excessive" or "usurious".

Instead, Ms. Swanson's state law claims stem from the *timing* of the rate increase. Specifically, she challenges Defendants' retroactive increase of her interest rate, without regard to the amount of the increase. *See* SAC ¶¶ 28, 35. The timing or manner by which a charge is imposed is distinct from the *amount* of the charge. *See*, *e.g.*, *Saxton v. Capital One Bank*, 392 F.Supp.2d 772, 783 (S.D. Miss. 2005) ("it is not the per se amount of late fees or other 'interest' that plaintiffs challenge here but rather the allegedly improper and deceptive manner in which it was charged."); *see also Cross-County Bank v. Klussman*, 2004 WL 966289 at *6 (N.D. Cal. 2004) (same conclusion, adding that "[h]ence, this is not a claim for usury.") Accordingly, Defendants' misstatement of Ms. Swanson's claims does not meet their burden of proving that her claims conflict with the NBA.[5]

### 2. Ms. Swanson Does Not Seek to Impose an Impermissible Restriction on the Terms of Credit Described in 12 C.F.R. § 7.4008(d)(2)(iv).

Next, Defendants claim that Ms. Swanson seeks to enforce a state law limitation on the terms of credit that national banks are allegedly free to set under subparagraph (d)(2)(iv) of 12 C.F.R. § 7.4008. That provision states:

> (2) A national bank may make non-real estate loans without regard *to state law limitations* concerning: . . .
>
> (iv) The terms of credit, *including* the schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

12 C.F.R. § 7.4008(d)(2)(iv) (emphasis added).

Subparagraph (d)(2) of § 7.4008 is inapplicable here because it is expressly directed against "state law limitations concerning . . ." the various items listed in paragraph (d)(2), *i.e.*,

---

[5] In an apparent effort to broaden NBA's scope, Defendants claim that "interest" under the NBA includes everything that is a "finance charge" under TILA because TILA defines the term "finance charge" to include interest. That is logically backward. Just because interest is a form of "finance charge" under TILA, it does not follow that all finance charges are interest.

state banking laws specifically designed to regulate the particular terms listed.[6]  It is not aimed at state laws of general application because § 7.4008 goes on to exempt such laws from its reach to the extent they only incidentally affect the powers conferred by the NBA, such as the general law of contracts and torts.  *See* 12 C.F.R. § 7.4008(e) ("State laws that are not preempted.")

Also, subparagraph (d)(2)(iv) does not pertain to all credit terms.  As Defendants admit, it enumerates the credit terms to which it applies.  Interest terms are not listed and, to the contrary, they are discussed separately in (d)(2)(x).  *See* 12 C.F.R. § 7.4008(d)(2)(x) ("rates of interest on loans").  Terms concerning the timing of rate increases and notice are not listed at all.

Finally, § 7.4008 expressly states that national banks do not have unlimited power to impose credit terms.  Again, paragraph (c) of § 7.4008 prohibits national banks from engaging in unfair or deceptive practices.  *See* 12 C.F.R. § 7.4008(c).  Accordingly, § 7.4008(d)(2)(iv) does not demonstrate an express conflict between Ms. Swanson's state law claims and the NBA.

### 3. Ms. Swanson Does Not Seek to Impose a State Law "Disclosure Regime" Distinct from TILA.

Defendants also claim that Plaintiffs' state law claims are preempted "to the extent they seek to impose a new disclosure regime under state law."  As indicated by the "to the extent" language in the heading to this segment of Defendants' brief, Defendants have no basis for arguing that Ms. Swanson seeks to do any such thing.  She does not.

Ms. Swanson's state law claims arise from the additional money Defendants charged Ms. Swanson by retroactively increasing the APR on her account.  *See* SAC ¶ 30.  Any "notice" dimension of these claims stems from Defendants' violation of TILA.  As noted, TILA is a federal law, and thus it is not preempted by the NBA.  *See* 12 C.F.R. § 7.4008(a) (national banks are subject to federal law).  Accordingly, Defendants' "state law disclosure regime" argument does not demonstrate any express conflict with the NBA.

---

[6]  The federal supreme court and circuit court cases Defendants cite to support this argument addressed state statutes directed specifically at the conduct of banks, not laws of general application.  *See Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896) (statute regulating the use of an insolvent bank's assets); *Bank of Am. v. City and County of San Francisco*, 309 F.3d 551, 555 (9th Cir. 2002) (ordinance restricting banks' power to charge ATM fees).

### 4.    Defendants' Implied Preemption Argument Only Attacks Part of Ms. Swanson's State Law Claims – It Does Not Justify Outright Dismissal.

Unable to show that the NBA expressly preempts Ms. Swanson's claims, Defendants argue that Ms. Swanson's state law claims impliedly conflict with the NBA because "Congress did not condition its grant of the lending power to national banks on the banks' compliance with any state law *lending* requirements." *See* Defendants' Brief at pp. 13-14 (emphasis added). However, as shown, Ms. Swanson only seeks to enforce state laws of general application, not state law "lending" requirements.

The cases Defendants cite as examples of implied conflict preemption are inapposite for this same reason.  They address state attempts to specifically regulate the conduct of banks, which is not at issue here.[7]

Apparently recognizing this, Defendants claim that Ms. Swanson seeks to subject Defendants to "state law lending requirements" because allegedly she seeks an injunction that will:  "(1) impose limits on Defendants' default interest rates for cardholder accounts, (2) restrict the manner in which Defendants may calculate interest in accordance with its [sic] cardholder agreements, and (3) require specific 'advance' disclosures by Defendants of future interest rates to be applied beyond the Cardholder Agreement itself."  Defendants' Brief at p. 14.  This argument fails for two reasons.

First, Ms. Swanson seeks no such injunction.  She only generally requests an injunction stopping the retroactive-rate-increase practice at issue.  *See* SAC ¶¶ 32, 38.  She does not seek an order limiting the interest rate Defendants may charge or how interest is calculated.  Nor does she seek disclosures beyond those required by under federal law by TILA, which are not

---

[7]  Defendants cite *Davis*, 161 U.S. at 283 (law regulating the use of an insolvent bank's assets); *Easton v. State of Iowa*, 188 U.S. 220, 227 (1903) (multiple banking laws); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 28-29 (1996) (law restricting banks from selling insurance); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 374 (1954) (bank advertising law); *Bank One v. Guttau*, 190 F.3d 844, 849-850 (8th Cir. 1999) (ATM law); *Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 328 (4th Cir. 2006) (commissioner of financial regulation tried to limit prepayment penalties on adjustable rate mortgage loans); *Wells Fargo Bank v. Boutris*, 419 F.3d 949, 954 (9th Cir. 2005) ("California's regulation of residential mortgage lenders . . ."); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 309 (2d. Cir. 2005) (Connecticut banking laws); *Wachovia Bank, N.A. v. Watters*, 431 F.3d 556, 557 (6th Cir. 2005) (Michigan banking laws).

preempted.  *See* 12 C.F.R. § 7.4008(a).

Second, even if Ms. Swanson sought the injunction that Defendants claim, that would not justify the outright dismissal of her state law claims because Defendants' argument only goes to one of the remedies sought.  Ms. Swanson also seeks to recover the additional money charged as a result of the retroactive rate increase.  *See* SAC ¶¶ 31, 38.  So even if Ms. Swanson cannot obtain an injunction, that does not affect her request for restitution and damages.  Accordingly, implied conflict preemption is not a basis for dismissing Ms. Swanson's state law claims.

### 5.    Ms. Swanson's Common Law Claim Is Based in Part on Defendants' Violation of the Law of Their Home State.

The NBA permits national banks to adopt the law of their home state for the purpose of determining the interest rates they may charge.  *See* 12 U.S.C. § 85.  However, the bank does not simply adopt the interest rate ceiling for that state.  The bank adopts all of the state's regulations related to interest rates.  *See*, *e.g.*, *First Nat'l Bank v. Nowlin*, 509 F.2d 872, 876 (8th Cir. 1975) ("the federal Act adopts the entire case law of the state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state.")

Ms. Swanson's common law claim does not conflict with the NBA for the additional reason that is based on Defendants' violation of Delaware law relating to increases in credit card interest rates.  *See* SAC ¶ 29.f.  Delaware law provides that a bank may only change the rates on a credit card "in accordance with a schedule or formula" in the cardholder agreement:

> If the agreement governing the revolving credit plan so provides, the periodic percentage rate or rates of interest under such plan *may vary in accordance with a schedule or formula*. Such periodic percentage rate or rates may vary from time to time as the rate determined *in accordance with such schedule or formula* varies….Without limitation, a permissible schedule or formula hereunder may include provision in the agreement governing the plan for a change in the periodic percentage rate or rates of interest applicable to all or any part of outstanding unpaid indebtedness, whether by variation of the then applicable periodic percentage rate or rates of interest, variation of an index or margin or otherwise, contingent upon the happening of any event or circumstance specified in the plan, which event or circumstance may include the failure of the borrower to perform in accordance with the terms of the plan.

5 Del. Code § 944 (emphasis added).  Defendants' retroactive increase of Ms. Swanson's rate violates this provision because it does not stem from any "schedule or formula" disclosed in the

cardholder agreement. As noted, for rate increases stemming from a default, the agreement only describes the circumstances under which the rate *might* increase. Thus, the retroactive increase of Ms. Swanson's rate was not in compliance with the state law Defendants chose to follow under the NBA.[8] Accordingly, because Ms. Swanson's common law claim incorporates 5 Del. Code § 944, it is consistent with the law of Defendants' home state, and thus cannot conflict with the NBA. In short, Defendants' motion to dismiss Plaintiffs' state law claims on preemption grounds should be denied.

### Conclusion

Count I states a claim under TILA because Defendants failed to give written notice of their decision to increase Ms. Swanson's interest rate before the effective date of the increase.

Defendants cannot meet their burden of demonstrating that Counts II and III are preempted by the NBA because the consumer fraud claim is consistent with the NBA's express regulatory provisions, because both of Ms. Swanson's state law claims are based on laws of general application that do not expressly or impliedly conflict with the NBA, and because Ms. Swanson's common law claim is based in part on Defendants' violation of the banking laws of their home state. Defendants' motion to dismiss should be denied.

Respectfully submitted,

    s/Michael S. Hilicki    .
One of Plaintiff's Attorneys

---

[8] In response, Defendants presumably will cite *Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740 (N.D. Cal. 2006) and *Penner v. Chase Manhattan Bank USA, N.A.*, 2006 WL 2192435 at *2 (W.D. Wash. 2006). *Evans* sided with the defendant on this issue because the agreement in that case allegedly "describ[ed] what events *will cause* default rates to go into effect . . ." *Evans*, 2006 WL 213740 at *3. Here, the agreement only states what events *might cause* the default rates to go into effect, which is not a schedule or formula in any sense. The *Penner* case simply followed *Evans*. *See Penner*, 2006 WL 2192435 at *4. Accordingly, these cases do not help Defendants.

Lawrence Walner
Michael S. Hilicki
Lawrence Walner & Associates, Ltd.
150 North Wacker Drive, Suite 2150
Chicago, Illinois 60606
Tel:    (312) 201-1616
Fax:    (312) 201-1538

Barry L. Kramer
Law Offices of Barry L. Kramer
11111 Santa Monica Blvd.
Suite 1860
Los Angeles, California 90025-3352
Tel:    (310) 235-9980
Fax:    (310) 235-9982

## CERTIFICATE OF SERVICE

I, Michael S. Hilicki, certify that on May 28, 2008, I caused a copy of the attached **Plaintiff's Response in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint** to be served on the persons on the service list and at the email addresses below via the Court's ECF filing system.

    s/Michael S. Hilicki   .
Michael S. Hilicki

### Service List

Robert M. Dawson (c/o Brandon Fernald)
Brandon C. Fernald
Fulbright & Jaworski L.L.P.
555 South Flower Street
Forty-First Floor
Los Angeles, CA 90071
Tel:    (213) 892-9215
Fax:    (213) 892-9494
bfernald@fulbright.com

William J. McKenna
Katherine E. Licup
Foley & Lardner LLP
321 North Clark
Suite 2800
Chicago, IL 60610
Tel:    (312) 832-4500
Fax:    (312) 832-4700
wmckenna@foley.com
klicup@foley.com